SOUTHWICK, P.J.,
for the court:
¶ 1. John Slay was found in violation of six meat inspection laws and regulations by a hearing officer of the Department of Agriculture and Commerce. After an appeal to circuit court, the judgment was affirmed. In his subsequent appeal to this Court, Slay alleges that the evidence was insufficient, that various participants in the administrative proceedings had conflicts of interests, that certain testimony was the product of improper inducements, and that several witnesses whom he wished to call were not made available. We find that two of the violations were not proven. We reverse and remand for reassessment of the appropriate penalty.
FACTS
¶ 2. Slay owns and operates Slay’s Processing Plant, a slaughter house operating under a license issued by the Mississippi Department of Agriculture and Commerce. In February of 1998, George Sellers, who owned a local grocery store, asked Slay to butcher two calves. One calf was to be sold in Sellers’ store and the other was for Sellers’ personal use. Slay contacted Albert Creel, an inspector for the Department, and asked that he come to the plant to inspect the calves. There was evidence at the later hearing that Creel was not the proper inspector for Slay’s facility.
¶ 3. Slay had the first calf butchered and quartered before Creel arrived. Creel later inspected the carcass and stamped it as inspected. The second calf, which was fbr Sellers’s personal use, was butchered and quartered the next day without an inspection. Slay then attempted to deliver the beef to the Sellers’ grocery. Jim Meadows, the Assistant Director of the Meat Inspection Division of the Department, arrived at the store as the delivery was being made. Meadows found three quarters of the non-inspected calf in the store and found the rest in Slay’s transportation cooler. All of the meat was retained by Meadows for investigative reasons. Creel first stated that he had not inspected the calves, but later explained that he had inspected and stamped one calf after it had been butchered.
¶ 4. As a result of the investigation, the Department served a complaint against Slay charging him with six violations of the meat inspection law of Mississippi. A hearing officer found that Slay had slaughtered the calves without a license, slaughtered a calf without receiving a prior (ante-mortem) inspection, transported a beef carcass without the inspection, represented that the calf was properly inspected, transported adulterated beef, and failed to stamp the other carcass “not for sale” as required in a custom slaughter. In the first level appeal, the Circuit Court of Clarke County affirmed. Slay’s subsequent appeal to the Supreme Court has been deflected here.
*1261 DISCUSSION

1. Six Violations of Meat Inspection Laws

¶ 5. We are reviewing a decision of an administrative agency. It will be upheld unless it is not supported by substantial evidence, was arbitrary or capricious, was beyond the power of the agency, or violated a statutory or constitutional right. Mississippi Comm’n on Envtl. Quality v. Chickasaw County Bd. of Supervisors, 621 So.2d 1211, 1215 (Miss.1993). This Court cannot reweigh the facts of the case. Mississippi State Bd. of Public Accountancy v. Gray, 674 So.2d 1251, 1253 (Miss.1996). With this standard in mind, we examine each violation that was found.

a. Slaughter of beef calves without a license.

¶ 6. The hearing officer found that Slay’s license did not permit him to slaughter beef calves. Slay disagrees. The license states that Slay may “engage in the processing of Meat and Meat-Food products under the Laws and Regulations of the State of Mississippi.” No restrictions appear on the license itself. What this license permits has been disputed throughout these proceedings.
¶ 7. Any establishment that slaughters animals must apply for a license from the state Department of Agriculture and Commerce. Miss.Code Ann. § 75-33-7(1) (Rev.2000). Under Department regulations, no establishment can be “used for any other purpose than that for which it is specifically approved.” Miss. Meat Inspection Regs., Sec. 11(B) (July 1997). No statute nor regulation shown to us nor that we have discovered states that what must be “specifically approved” is the precise kinds of animals that may be slaughtered, nor have we found a formal statement of how approval of any particular activity is signified. In fact, neither statute nor regulation explicitly addresses whether a license may or must be limited to the slaughter of specific kinds of animals. Yet the Department argues that such restrictions are permissible and enforceable, are understood by the license holder, and are revealed by the original application for a license and each annual renewal request. We review the licensing procedure and the documents in the record regarding each step.
¶ 8. The licensing scheme was part of the Meat, Meat-Food and Poultry Regulation and Inspection Law of 1960. Miss. Code Ann. § 75-33-1 to -39. (Rev.2000). Animals covered by the licensing statute include cattle, sheep, goats, exotic animals, swine, horses, mules and rabbits. Miss. Code Ann. § 75-33-3(l)(b) (Rev.2000). Slay’s father applied for the initial license in 1960 and indicated on the application that he had already been in business twenty year’s. The 1960 application form required that he “describe completely and concisely the business carried on.” Slay’s father indicated in the blank that he processed hogs in the winter months and sold wholesale.
¶ 9. The license must be renewed annually. Miss.Code Ann. § 75-33-7(1) (Rev. 2000). The license form issued each year contains blanks that are filled in with the name, county and city of the establishment. Also shown are the dates of issuance and expiration of the license. Nothing on the face of the license indicates any limits on what animals may be processed at the establishment.
¶ 10. Slay’s renewal application for the time in question is included in the record. On one sheet of paper, the Department notified Slay of the need to renew his license, then required that he sign and return a certificate indicating any changes *1262 that had occurred in the operation of the facilities since the date of the original license application. No changes were noted on the renewal certificate dated in June 1997. Even if in a pre-1997 renewal application Slay had indicated some change to the operations as they existed in 1960, this renewal certificate would seem to require that all changes since 1960 continue to be noted.
¶ 11. The Department argues that the license, general in language, was limited to what was shown on the form application as Slay’s then-current operations, together with any changes shown on a renewal application. The application form does not indicate that the current activities are the extent of what the applicant wishes covered by a license. There is no place on the original or renewal application form to indicate that a licensee wishes to increase his authority beyond his present activities; the only blank relevant to this question is for indicating what activities are already being conducted and whether they constitute a change from the original application. The Department’s position implies either that there is some other means besides the renewal form for a licensee to apply for an increase or change in authority, or if not, then the licensee must start exceeding the original authority and then report it in his next license renewal as part of the business that he is then conducting. If it is the latter, then the Department’s own (unstated) procedures encourage temporary violations of a license in order to expand the licensee’s authority at the time of the next renewal.
¶ 12. The license is a formal document from this governmental agency that authorizes the recipient to perform certain regulated activities. Though nothing in statute or regulation, nor in any written guidance from the Department presented in this record, informs the public or this Court that what is on the face of the license should be ignored, the Department is arguing that “everyone knew” how to discern the limits of a license. Whether general knowledge, unsupported by any formal pronouncement of an agency, can substitute for something as basic as minimal clarity in the breadth of a license, is uncertain. We do not address the legal sufficiency of the point until we determine whether there is any factual basis for the argument.
¶ 13. The evidence that there was a clear understanding by Slay and licensees generally of the limits of authority is minimal. Dr. Robert H. West, who at the time of the administrative hearing was Director of the Meat Inspection Division of the Department, acknowledged that nothing on the license indicated a limit to the authority. Instead, he stated that the “back-up paperwork is what determines what the plant is eligible to process.... ” One of the inspectors testified that he had been told by Jim Meadows, Assistant Director of the Department’s Meat Inspection Division, that Slay’s license did not authorize the slaughter of beef cattle.
¶ 14. Disputing this, Slay introduced what were called “kill sheets” that revealed that he had received official inspections for slaughtering cattle at his plant for the six years that ended in 1996, or just the year before the incident at issue here. These were documents required to be submitted on a periodic basis to the Department and no issue had been raised at that time that Slay’s license did not permit him to slaughter cattle. Slay testified that these pre-1997 slaughters of beef were on an infrequent basis as customers requested it. The inspector called by the Department acknowledged on cross-examination by Slay that he had signed these Ml sheets and had not raised a question at the time with Slay about his authority.
*1263 ¶ 15. There is other evidence in the record, but none of it constitutes substantial evidence that the Department gave notice to Slay of the limits of his license. The evidence does not support that Slay violated a clearly defined restriction on the use of his plant when he slaughtered the two calves in 1997. The issue is not the expertise of the Department in interpreting the statutes that it administers and its own rules. We would give deference to the Department’s reasonable interpretation of the statutes under which it operates. What we find defective is the failure of the Department to present in any form reviewable by the Court on the record before us an explanation given to people such as Slay of the limits of the license that they are issued.
¶ 16. It is true that the dissent says the whole scheme is “exceedingly clear;” We are holding that it was not clear at all. Both potentially are ipse dix-its, i.e., it’s so because I say it’s so. To a large extent, that is also the problem with the Department’s position. We are reversing because nothing in writing, in the regulations, on the license, or in some other form that was presented in this case explained to the license-holder that what he had listed in 1960 as the current operations at his plant were the limit of what his license permitted.
¶ 17. An agency acts arbitrarily when the most basic rights that are received by a licensee are unexplained in the license itself or in any rule or policy announced in any manner that has been shown to us. Slay may have actually understood the manner in which the Department interpreted licenses. No finding on that was ever made, and even the principal inspector assigned to Slay’s plant did not appear to realize the limits. We do not accept that significant sanctions can be imposed by a governmental agency for a citizen’s violation of unwritten rules that are contrary to the plain language of the license issued and are unsupported by any formal pronouncements of the agency that have been shown to us. For the very reason that courts must give substantial discretion to agencies, a court must be satisfied that a regulated party has received adequate notice of the responsibilities that are imposed on him. We have no such confidence on the present record.
¶ 18. We reverse and render the finding that Slay failed to conform to unstated limits in his license that he could not slaughter calves. This does not affect the findings of other violations, which we now turn to discuss.

b. Slaughter of a beef calf without receiving an antemortem inspection.

¶ 19. Even had Slay received authority to slaughter beef, the Department found that he failed to acquire an ante-mortem inspection. Slay argues that he had contacted Albert Creel, a state inspector, about the inspection of the calves. He argues that Creel told him to go ahead and butcher the calf for Sellers’s store and he would inspect the carcass later.
¶ 20. According to Slay, he followed Creel’s directions and had one calf slaughtered before Creel arrived. Once Creel arrived, he inspected the slaughtered calf and stamped the quarters as having been inspected. The Department argues that Creel’s improper actions do not exonerate Slay. We agree that if the requirements for inspection are clear, a licensee’s acquiring the assistance of an inspector in the violation of them does not exonerate him.
¶ 21. Under the meat inspection laws, cattle must receive an ante-mortem inspection before entering the slaughter facilities. Miss.Code Ann. § 75-35-7 (Rev. *1264 2000). After the animal is slaughtered, it receives another inspection, a post-mortem inspection. Miss.Code Ann. § 75-35-9 (Rev.2000). It is only when both inspections are completed and passed that a carcass can be stamped “inspected.” Miss. Code Ann. § 75-35-13 (Rev.2000). Only with this stamp can the meat be processed for human food. Id. In accordance with the statute, no person can slaughter a calf unless they comply with these rules. Miss.Code Ann. § 75-35-21(a) (Rev.2000). According to the statements by Creel and Slay, the calf did not receive an ante-mortem inspection. Therefore, the evidence supports the hearing officers finding that Slay slaughtered the beef calf without the required ante-mortem inspection.
c. Transporting a beef carcass without an ante-mortem inspection.
¶ 22. The third violation in the complaint was that Slay transported a carcass that did not receive or pass an ante-mortem inspection. Once proof of the transportation was received, this finding follows inevitably from the previous finding that the calf had not received an inspection before it was slaughtered. Slay argues that he had the right to transport the carcass as it did have an inspection stamp. However, although the stamp was on the carcass, the animal had not received an ante-mortem inspection and Slay was aware of that omission.
¶ 23. These regulatory statutes prohibit transporting any carcass that has not been inspected. Miss.Code Ann. § 75-35-21(b)(2) (Rev.2000). Once Slay placed the quarters into his cooler attached to his truck and drove it to the store, he was in clear violation of this requirement.

d. Knowingly representing the carcass as inspected.

¶ 24. Slay was also found to have represented to another person that the quarters had been inspected when he knew that they had not received the required ante-mortem inspection. While Slay was unloading the quarters at Sellers’s store, Meadows told him that since the calves had not been inspected they could not be sold at the store. This is what Meadows then testified:
And Mr. Slay asked me, “How do you know they hadn’t been inspected?”
I said, “Well, I’m just assuming by what’s in there that hadn’t been inspected, let’s go look.” [The two men went to look into the truck.] I asked Mr. Slay at that time who inspected those animals, and he said that Albert Creel did.
¶ 25. This is the only evidence to support that Slay falsely stated that the calf had been inspected. Slay knew that the calf had been slaughtered before Creel arrived at the plant, but Creel upon arrival actually performed a post-mortem inspection. What we would have to find from this testimony to uphold the violation is that Meadows’ question, which sought only the name of someone who inspected the animal, required that Slay say either that no one had — but that was incorrect, since Creel had inspected it after slaughter — or that Slay explain that no ante-mortem inspection had been conducted and only a post-mortem one had occurred. That latter answer was not required by the general question that was posed.
¶ 26. Under the meat inspection laws, it is unlawful to represent that an item has been inspected and passed when the person knows that to be untrue. Miss.Code Ann. § 75-35-23(2)(f) (Rev.2000). Slay was not asked whether the animal had been inspected both before and after slaughter, and whether it had passed. He was solely asked who had inspected the calf. He named the person, and did not volunteer that the inspection was flawed. *1265 The answer to the general question was truthful even if not detailed. The dissent argues that the question that Meadows asked necessarily required a statement that no proper inspection was conducted, and that Slay’s answer necessarily was an assertion that there had been a proper inspection. . To read that much into the simple question and simple answer creates the potential for unknown and unknowable violations by any licensee who is in a conversation with an inspector. We reject that reasoning.
¶ 27. The evidence fails to supports the charge made. We reverse this finding of a violation.

e. Transporting an adulterated beef carcass.

¶ 28. The hearing officer also found that Slay had transported adulterated beef carcasses in violation of the meat inspection laws. Slay argues that the carcasses were not adulterated unless a veterinarian had determined them to be adulterated. Since no veterinarian inspected the carcasses, Slay argues that he cannot be charged with transporting adulterated carcasses. The adulteration alleged by the Department arises from the fact that the cooler used to transport the beef quarters was in an unsanitary condition.
¶ 29. Transporting an adulterated carcass is unlawful. Miss.Code Ann. § 75-35-21(b) (Rev.2000). “Adulterated” has several definitions, one of which is any carcass that “has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.” Miss.Code Ann. § 75—35—3(j)(4) (Rev.2000). Meadows testified that the cooler in which the quarters were transported contained blood stains and meat particles. The bottom of the cooler was rusty and dirty, and the carcass was touching some of this filth. Photographs were introduced that showed the blood and particles in the cooler. The quarters were also placed on a wool blanket and stacked on top of each other including the second set of beef carcasses which received no inspection. Therefore, the evidence supports the finding that Slay transported adulterated carcasses in violation of the statute.

f Conducting a custom slaughter without stamping the carcass “not for sale”.

¶ 30. The second calf was slaughtered and quartered without being inspected. Animals slaughtered for personal consumption do not have to be inspected. Miss.Code Ann. 75-35-31(1) (Rev.2000). This is called a “custom slaughter.” However, Department regulations explicitly require compliance with the federal laws. Miss. Meat Inspection Regs., Sec. IX (July 1997). Among the regulations adopted under the federal Meat Inspection Act, is one that requires custom slaughtered carcasses to be stamped “not for sale.” 9 CFR § 316.16.
¶ 31. Slay performed a custom slaughter on the second calf for personal consumption, but it was not properly stamped. This violation was adequately shown.

2. Creel’s testimony.

¶ 32. Slay argues that the inspector Creel, who had participated to some degree in the violations, testified falsely in return for keeping his job with the Department. Slay wished to introduce proof regarding a personnel action brought by the Department against Creel as a result of his stamping the beef while knowing that he had not conducted an ante-mortem inspection.
*1266 ¶ 33. Slay sought to show that Creel was allowed to retain his job under an agreement with the Department. Offered but not accepted into evidence was a copy of the agreement. Slay was allowed to question Creel about whether a personnel action had been brought against him. Creel admitted one had been. Creel was not allowed to answer whether he was satisfied with the outcome.
¶ 34. Under the Rules of Evidence, interest or bias can be shown. M.R.E. 616. These rules, though, are not directly applicable at administrative hearings. The hearing officer was aware of Creel’s likely violation of the inspection requirements, and knew that a disciplinary action had been brought but Creel was still employed. Whether or not Creel was still at the Department because of a specific written agreement that required Creel to testify against Slay, the incentives for Creel to be helpful were obvious on this record. Thus the point of possible bias was made without the documentary evidence.
¶ 35. Moreover, the relevance of Creel’s testimony was his admission that he failed to make the ante-mortem inspection. Slay admitted that fact. Therefore the hearing officer’s prohibiting a more thorough exploration of Creel’s credibility did not prejudice Slay.

S. Testimony and misconduct by Department’s counsel.

¶ 36. Slay alleges misconduct by Robert Graves, the Special Assistant Attorney General who represented the Department at the hearing. During the hearing, Slay stated that he intended to call Graves to the stand as a witness. Graves objected, stating that he had no personal knowledge of the facts of the case. The hearing officer sustained the objection.
¶ 37. During normal civil proceedings, an attorney representing a party may testify if it is necessary to prevent a miscarriage of justice. Pearson v. Parsons, 541 So.2d 447, 452 (Miss.1989). The decision whether to allow an attorney to testify is a discretionary one for the judge. Id. at 453. Slay does not allege that Graves had knowledge of the facts of the case. It was not an abuse of discretion to refuse to permit Graves to testify.
¶ 38. Slay also accuses Graves of misconduct in refusing to direct twelve people from the Department to be at the hearing. Prior to the hearing, Slay mailed a letter to the Department requesting that the witnesses be present. In response, the Department sent Slay a letter explaining that he would have to prepare subpoenas for each of them. The subpoenas would then have to be signed by the Department and served by Slay. Slay did not comply.
¶ 39. In support of his argument that subpoenas were unnecessary, Slay cites a statute that gives the defendant wide latitude in presenting his defense. Miss. Code Ann. § 41-51-25 (Rev.1993). That is correct, though this specific statute only applies to hearings dealing with the suspension of license for the operation of rendering plants. Id. Wide latitude, however, does not mean ignoring procedural rules. Under the meat inspection statutes, the Commissioner has the authority to issue and sign subpoenas. Miss.Code Ann. § 75-35-315(1) (Rev.2000). The Department acted within its authority by requesting that Slay prepare the subpoenas for his witnesses and present them to the Department for signature. No error occurred.

U. Conflict of Interest.

¶ 40. Slay’s next assignment of error is that Graves, Meadows, and Joe Hardy, the hearing officer, should have been disquali *1267 fied from the hearing due to conflicts of interest. We will examine each alleged conflict.
¶ 41. Graves represented the Department during a personnel hearing involving Slay’s son. During those proceedings, Slay alleges that Graves falsified documents. There is no evidence to support this accusation. In addition, the circumstances surrounding the personnel matter and the violations asserted against Slay were not related.
¶ 42. Slay argues that Meadows was disqualified due to his own inability to follow the inspection rules and regulations. During the hearing, Slay questioned Meadows on a number of rules that he allegedly failed to follow. The hearing officer made no finding as to these allegations, nor was there any meaningful evidence supporting them. The hearing officer explained that Slay would have to bring a separate action against Meadows as the hearing was only concerned with the alleged wrongdoing by Slay. No conflict of interest was shown.
¶ 43. Hardy was the hearing officer assigned to the personnel matter against Slay’s son. Slay would need to present evidence of a personal bias or financial interest arising from this fact. United Cement Co. v. Safe Air for the Env’t., Inc., 558 So.2d 840, 842-43 (Miss.1990). Not only did Slay not ask the hearing officer to recuse himself, Slay specifically stated at the hearing that he was not requesting that Hardy recuse himself. Slay only reminded Hardy that he had sat as the hearing officer in his son’s proceedings.
¶ 44. There were no conflicts of interest as to any of the three individuals.

5. Misconduct by the Circuit Court Judge.

¶ 45. Slay alleges that the circuit court judge acted improperly regarding the Department’s appellate brief. The Department appears not to have filed its brief with the circuit court clerk. Instead it submitted the brief directly to the judge. The Department filed only a copy of the cover letter and briefs cover page in the clerk’s office.
¶ 46. Uniform court rules guide the filing of briefs on appeals to circuit courts from administrative agencies. The relevant rule provides that the briefs “must conform to the practice in the Supreme Court, including form, time of filing and service.... ” URCCC 5.06. Briefs in the Supreme Court are filed with the court’s clerk. M.R.A.P. 25(a). The Department’s brief arguably should have been sent to the circuit clerk, though where to file is not mentioned in Rule 5.06. Regardless, it was not reversible error for the judge to accommodate a party by accepting the brief and having it filed in the clerk’s office. The Mississippi Rules of Civil Procedure allow for all pleadings and other papers to be filed with the judge with the judge’s approval, who then marks them filed and submits them to the clerk. M.R.C.P. 5(e). The judge instead could have refused to accept the brief, notified the Department of his refusal, and required the Department properly to file. The Department could have requested an enlargement of time to file. M.R.A.P. 26(b), incorporated by URCCC 5.06. Considering the general flexibility in circuit court to permit filings with the judge, and the discretion the judge would have to permit additional time to file had he not accepted the Department’s brief, we find neither error nor prejudice in the actions taken in this case.
¶ 47. The final person Slay claims to have acted improperly is the Circuit Court Clerk of Clarke County. However, he never explains how the clerk affected the *1268 case, unless it is in connection with accepting the filing of the Department’s brief. We find no error in the clerk’s filing the brief after receiving it from the circuit judge.

6. Fees.

¶ 48. Slay requests that this Court require the Department to pay all court costs and grant him reasonable fees in the nature of attorney’s fees. Under the Rules of Appellant Procedure, when a judgment is affirmed, the appellant is generally charged with the costs of appeal. M.R.A.P. 36(a). Here, since we are affirming in part and reversing in part, we are splitting the costs of the appeal, one-half to the appellant and one-half to the appellees.
¶ 49. As to attorney’s fees, in the absence of a contractual agreement or statutory requirement for attorney’s fees, fees are not awarded unless in conjunction with punitive damages. Stokes v. Board of Dir. of La Cav Imp. Co., 654 So.2d 524, 529 (Miss.1995). That does not apply here.

Conclusion

¶ 50. We have upheld all the violations found against Slay except for the slaughtering of calves without proper authorization in his license, and except for falsely stating that the calf had been inspected. No additional evidence on those matters can be presented, as we are holding that the Department, who bore the burden of proof on the issues, failed to carry it.
¶ 51. Having found Slay to have committed only four of the six offenses, we are faced with whether to affirm the suspension already entered or to enter some other judgment. In similar circumstances, namely that the Board of Nursing had imposed punishment because of the collective charges against a nurse, then the Supreme Court reversed some but not all of the charges, the Court remanded to the administrative agency to reassess the penalty. Mississippi State Bd. of Nursing v. Wilson, 624 So.2d 485, 492 (Miss.1993). We therefore remand to the Department for a determination of whether the same penalty should be imposed as before, or some other.
¶ 52. THE JUDGMENT OF THE CLARKE COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART TO THE MISSISSIPPI DEPARTMENT OF AGRICULTURE AND COMMERCE. COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND TO THE APPEL-LEES.
McMILLIN, C.J., THOMAS, LEE, and MYERS, JJ., CONCUR. IRVING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., BRIDGES, and CHANDLER, JJ. BRANTLEY, J., NOT PARTICIPATING.